Good morning. May it please the Court, my name is Karen Levine. I'm representing the petitioner, Ernesto Salgado. I'd like to reserve about three minutes. Okay, watch the clock. And if you could speak up just a little bit, Ms. Levine, you have a very soft voice. Sorry. Petitioner was the victim of and prejudiced by constitutional violations committed by the Immigration Department, the immigration judge, and ineffective assistance of counsel. I might add the Immigration Department has mishandled his case almost from the very beginning. He was unconstitutionally picked up and illegally taken to Mexico when he was already in deportation proceedings. Government attorneys misrepresented to the immigration judge, the petitioner, the board, and this Court that he was in exclusion and a suppression hearing regarding the evidence resulting from the above wrongful deportation would take place there. And if he was successful in winning suppression, then he'd go back into deportation where he was eligible for suspension of deportation. The I.J., the immigration judge, never allowed any hearing regarding that wrongful deportation. Now, where was the representative? I know the I.J. at some point in these proceedings talked about, well, now that the circumstances have changed, we'll let you raise that claim about the supposedly unconstitutional arrest. Now, you said that that was, other than the I.J. saying that, where else was that represented? It was represented by the Immigration Department attorneys in their opposition to the appeal to terminate proceedings where the board said he can raise that issue in his exclusion proceedings. It was also raised. As I understand, what happened is that the I.N.S. moved to terminate deportation with the intent to initiate exclusion proceedings because now he'd been picked up coming back after this being hustled out of the country, at least by your client's characterization. And so they were telling the I.J. that we want to terminate deportation. We'll move this into an exclusion proceeding. This is still pre-IRIRA, right, when they're doing that? Exactly. Okay. And so at that point, you'll get a chance, you're saying, to raise the issue. He'll get a chance to raise the issue of the supposedly unlawful arrest. In exclusion proceedings. They told that to the board. And then when he appealed the termination up to this Court, the government attorneys represented to this Court, after he was not put in exclusion, but put in removal proceedings, that he could raise his defenses in exclusion. And if he was successful, he would go back into deportation where he was still eligible, eligible for release. I missed that in the record. And I must admit, this is a very, very confusing record. But it would be very helpful if you could give me an excerpt of record site to support what you just said. Because that's the first I've ever heard of a claim that the Petitioner was making, that there was a misrepresentation made to the Ninth Circuit that somehow compounded all the other errors that you're alleging occurred here. Can I get that? Yes, please. It would really be helpful to me. Actually, Ms. Levine, if you'd like to submit it on a piece of paper to the clerk afterwards, rather than take up all your time finding it, if it's going to take you a while to find it. It was submitted in the briefs by the government and by the motion to suppress for lack of jurisdiction that this court didn't have after I, you know, because... I mean, I saw those representations made to the immigration judge, but you said that there was an affirmative misrepresentation made to the Ninth Circuit. Yes, in their briefs when they, after they had put an end to removal. Well, in fact, the mem dispo that was filed says the Immigration and Naturalization Service has responded that Petitioner may litigate his claims regarding the legality of his departure... Exactly. ...as well as litigate the question of whether he is properly in exclusion at an exclusion hearing. So is that what you were referring to? Yes. Okay. But it was in their briefs, and so the court might have based their decision on that representation. That's sufficient. Okay. And that answers my question. Thank you. Okay. Or maybe I should thank Judge Fischer. Yes. No, thank Judge Tashima. Thank you. She was on panel. And so he's never, to date, had any hearing on his allegation of wrongful deportation. Let me ask you this. One of the things that troubles me, I guess it's probably the worst fact that you have to deal with, is the fact that he attempted to reenter with a false document. Right. And if we were to, and I don't know if we have the authority to do it or not, but to order the whole situation returned to the status quo as it existed in 1996, as a matter of the power of this court, how do we overlook the fact that he committed a separate illegal entry and a separate criminal offense when he paid $200 for a false document and then tried to use it to gain entry at the Otay Mesa Court of Entry? Right. The only reason he had to do that is because he had to come back because he had to. Well, there was a different way he could have done it. He could have called his lawyer and said, I'm in Mexicali or Tijuana, I shouldn't be here. The lawyer could have obtained an order so that he could have been paroled into the United States in order to return to Immigration Court, but instead he resorted to self-help. And as sympathetic as I am to your client's position, help me get over what I view as a fairly difficult legal hurdle. I can't, I don't have the power that the executive has to, you know, pardon him for that offense. Well, if he would have come in without getting caught, none of this would have happened. That's great self-help. Great answer, but I don't think it helps on this record. But there was another case that was unpublished, and I realize you can't cite two unpublished cases, that a Ninth Circuit court said, well, it doesn't make sense if he would have come in without being caught, then he wouldn't have. But he did get caught. Yes, he did. And in essence, you're looking for a permanent form of relief that will allow him to stay here. But if, but that means that we have to just forget about the fact that he committed this other violation in the middle of this whole affair. Well, maybe that could be taken into consideration after he's gotten his suppression hearing, and when he has a hearing on his next. Does the Attorney General have the power to do that? I don't know if he does or not. To pearl him back in? No, no, no. To, in essence, forgive the attempted illegal reentry. Well, wasn't that, we argue that that's a direct result of him being thrown out of the country. No, I understand. Okay, all right. There may not be an answer to my question, I don't know. But it is an obstacle that I see to giving you the relief that you're asking for. Well, mainly we're just asking for him to have a hearing on his suppression. Okay. Okay. Why don't you save the rest of your time for rebuttal. Thank you. Good morning. May it please the Court. My name is Jocelyn Wright. I represent Respondent, the United States Attorney General. There are two decisions before the Court today, and I think it's important to remind the Court what exactly is before it. The first decision is the Board's November 12, 2002 decision, finding Mr. Salgado inadmissible in removal proceedings and rejecting his claim of ineffective assistance of counsel for failure to comply with Lozada. And the second decision is the August 21, 2003 decision denying his motion to reopen and reconsider his case. And our position is both of those Board decisions should be affirmed based on the arguments that we've set forth more in detail in our brief. As to the finding of inadmissibility in these removal proceedings, there is really no challenge to the immigration judges or the Board's finding that he is inadmissible based on his lack of a valid visa or entry document. Yeah, I don't think the – I think we just heard what the issue is. Just to cut through it, it's disturbing, just speaking for myself, that if you accept his facts as true, what went on here is that he had been put in by the INS into a deportation proceeding. He had a pending hearing, and he's then yanked off the streets – and again, I'm just taking their characterization – and deported across the border. So now he's pulled out of the lawful process before IRIRA comes along and changes the ground rules. And he's trying to get the facts of this being hustled out of the country before a judicial officer. And he's told by the IJ, you'll get a chance. We're going to litigate that. We'll have a hearing on it, and we'll deal with that. And looking at the record, apparently the earlier panel of the Ninth Circuit was told the same thing. We're going to let him get a chance to argue that, but it has to be in the proper forum. So at the end of the day, he doesn't wind up getting that hearing. The IJ is saying, well, I can't do it now. I'll give you a hearing on the circumstances of your arrest on the reentry. But he never gets that hearing. And if, in fact – let's just assume factually. I understand that it's disputed by the government. But he was, in fact, racially profiled, pulled off the street by the border agents, and hustled out of the country. So now he's been totally moved out of the process. That's the end of the story? Too bad. You're caught in a Catch-22. You came back illegally, and IRIRA comes in. So harm, or a foul harm, but no remedies. Is that really where we are? Well – Assuming, again, that there was an unconstitutional arrest in the first instance. Okay. Assuming that he was illegally arrested and deported, as he alleges, the appropriate forum for that would have been the exclusion hearing. And, again, because the appropriate forum would have been an exclusion proceeding under Landon v. Placencia in the Supreme Court, there's still simply no viable challenge to the immigration judge's decision to terminate the deportation proceedings. Because under his view, regardless of – that that issue was properly resolved in an exclusion hearing. How was it resolved in an exclusion hearing? Where did he get his hearing on it? Well, that's – and that's the thing. His attorney at that point then, when the immigration judge terminated the deportation proceedings, I believe it was in 1997 – All right. January 1997. January 1997. By that point, Herrera had been enacted in September of 1996. He was completely on notice as to the dissolution of exclusion versus deportation and the institution of legal proceedings at that point. Now, that's because he was out of the country, and his deportation hearing got – Well, I'm just saying that Herrera was already enacted. Herrera comes in. Yes. I understand. Now it comes in. And then his attorney at that point could have accepted the finding that deportation proceedings should be terminated and exclusion proceedings should be – is a proper form. His attorney at that point, however, made the legal judgment, if I may say – the professional judgment that he wanted to go ahead and appeal the finding, the termination of deportation proceedings, regardless of the fact that as of April 1, 1997, exclusion hearings would no longer be a viable option because removal proceedings were the only thing that would be available to the Immigration Service as the only process that would be available for aliens illegally in the United States after that date. Now, that legal judgment, that professional judgment to appeal that decision, had legal consequences. And the legal consequence was to basically waive the opportunity to contest the propriety of the arrest, the original deportation that he's saying was not a voluntary return. And if that was a valid professional judgment, and we note for the record that there has absolutely been no allegation that Mr. Cabrera, his attorney at that point, has been ineffective at any point in his handling of the case, the allegations of ineffective assistance only go towards the second attorney, Mr. Clank, then there's no basis for a finding of a due process violation simply because his attorney made the judgment that waiving the exclusion hearing for the purpose of litigating the propriety of termination of deportation at that point was the more that his efforts would be best served going that route. And also it's important to point out the INS, I'm sorry, the government's brief to the Ninth Circuit in the first petition for review is at the Supplemental Administrative Record at pages 55 through 65. And there's nothing in there that I could find that represented to the Ninth Circuit that he was currently in exclusion proceedings. And there's nothing certainly in the INS's appeal brief to the Board during the deportation termination proceedings representing that to the Board either. What the government has always held as a position to the Board and to this Court is that the immigration judge's decision to terminate deportation proceedings on January 1, 1997, was completely appropriate, because at that point, exclusion proceedings were still in existence and it was still a viable option to pursue, had Mr. O'Connor. But, Ms. Wright, wasn't the decision to terminate those proceedings in January of 1997 based upon the fact that he had made the attempt at illegal reentry in November of 1996? Isn't that what motivated the government to ask BIJ to terminate the deportation proceedings? So, if we go back to Ms. Levine's point, which is essentially, I guess, a Paul's graph argument, that but for the fact that he was illegally removed a few days before he made the attempted reentry in November of 1996, this would never have happened. He wouldn't have had to challenge the termination of the deportation proceedings. And, therefore, we should put him back in the same position that he would have been in in order to preserve the status quo and give him a fair shot at convincing an immigration judge that he's been terribly wronged here. And I think that your question earlier, in response to that argument, encapsulates the government's position, and that is that there's a supervening or superseding independent event, and that is his decision to go ahead and fraudulently use a passport in an attempt to regain entry into the United States to resume his illegal residence. And there's no – since his presence at all times in the United States was illegal prior to his alleged illegal deportation, he had no right, constitutional, statutory, or otherwise, to resume his illegal residence. Do you concede that prior to November of 1996 that he would have been eligible for relief because he had been here for seven continuous years? I believe he was prima facie eligible for suspension of deportation. Whether or not it would have been – whether or not he would have been able to establish a discretionary element of extreme hardship is another matter entirely. We just don't know, right? Exactly, but that's not the non-discretionary element. But he certainly would have had a shot at trying. Yes. Okay. Yes. But, again, because it was discretionary relief, there's no constitutional or vested liberty interest. It's simply a hope that he would have been granted relief had he been able to apply for it. But, again, the – I think the main point to understand here is if we –  I mean, we're just – to be put back in time, basically, to the law that existed in 1996. I don't believe the Court can do that unless there's a presumption that the INS's arrest and deportation of him in November of 1996, the contested deportation, unless there's a presumption that the INS acted illegally, then I don't think there's any basis for even – for going ahead and ordering that remedy because of the procedural question. What do you mean, the presumption? I mean, he's made a prime officiate claim. So, I mean, that's the issue. And it's – I mean, I come back to the disposition of this Court in the appeal where it says INS says he may litigate his claim regarding – this was written in 2000 – may litigate – INS has responded that Petitioner may litigate his claims regarding the legality of his departure as well as litigate the question of whether he is properly in exclusion or deportation at an exclusion hearing. That's a ruling in 2000, which seems to assume that, based on the INS representation, he has an opportunity to litigate the issues that's still alive at that time. No, Your Honor, I have to disagree. What the government said was – and you have to remember what was at issue. What the government may have said, but what this Court interpreted and then therefore wrote and wrote a disposition without taking up this issue, found it didn't have jurisdiction as a result of ERIRA. But that's how this Court understood the representation of INS. And that's what concerns me here. Well, to – Sort of falling into cracks here between – which is admittedly a complicated factual situation. I agree with that, Your Honor. And the first is the – this Court's 1998 disposition of the previous petition for review – and Judge Tachima was a part of that panel – was that it lacked jurisdiction because it was not a final order of the – No, that's the 2000. It was argued and submitted in March 2000. I'm looking right at it. I'm sorry. This is the 1998 petition for review is what I meant. But it was the 2000 decision by this Court. Yes. It was a dismissal for lack of jurisdiction. And so any commentary on perhaps the merits of the underlying petition could be dated. Well, no, no. If there's a due process violation, we do have jurisdiction if there is a due process violation lurking in the wings. And if, in fact, the panel – I mean, I don't – I'd have to go back and study it. I'm just saying it's not a clear cut, we don't have jurisdiction under any circumstance. If there is some due process – colorable due process claim, there are cases where we have exercised jurisdiction to look at the claim and whether the panel would have treated the issue differently if it thought it was by so ruling at that stage that they would be foreclosing ever raising this issue. I don't know what the panel would have decided. And I don't know either. But what I can't – what the record does reveal is that the INS never represented that he was in exclusion proceedings. What the INS was litigating was the – and what the Board affirmed with that opinion was the propriety of the immigration judge's decision – I'm sorry, what the Board affirmed. I don't believe it was with that opinion. But what they were litigating was the propriety of the immigration judge's decision on January 1997. Right. To terminate on representation of the INS that they wanted to put him into – And at that point, it was still possible to put him in exclusion proceedings. And you're saying because his counsel exercised his legal right to challenge the underlying decision, he basically took the gamble that RIRA would come along and wipe out if he lost. Right. The exercise of his professional judgment choosing that route had legal consequences. He could also have gone ahead and – Well, he was told at the time by the IJ, wasn't he, that essentially RIRA is coming and you've got to get this done by April. Right. So I don't think it would be fair to say that the lawyer didn't know at that point what the consequence was of his decision to appeal. Exactly. And that's my point, Your Honor. It was an unknowing exercise of his professional judgment. And so if that's the case, then he chose that route. And the legal consequence of waiving the exclusion hearing is not something that amassed a due process deprivation by the government. He also could have gone ahead, accepted the termination, and had the INS been able to initiate exclusion proceedings at that point, he still could have preserved the issue of whether or not termination of the deportation proceedings was appropriate in the exclusion proceedings. Would the government then, if he had chosen that option, then say he conceded a vested interest? It would be the quid pro quo that if he had foregone his right to appeal, it doesn't fall within the rubric of cases otherwise that say, well, it's up to the government, you can't. It's like the cases where we have it, where the petitioner initiates asylum just before a RIRA comes in so that, and we have held that that didn't guarantee. Exactly. There's no settled expectation that the government would actually grant it. You're saying that he could have waived his, at that point, he could have waived his challenge to the termination of deportation, gone into exclusion, and litigated. And even though at that point the government had only announced its intention to seek exclusion and not actually institute it. Isn't that correct? That's correct. Okay. So you're saying that he had a firm commitment that if he had, at that point, waived his appeal, that is the counsel exercises professional judgment, he could have then relied on having a enforceable, settled expectation that he would actually get the exclusionary hearing and get the suppression hearing at that point? I would not concede that, Your Honor. Well, that's what I suspect. Simply because the prosecutorial discretion. Right. So he was between a rock and a hard place to either hope to litigate and win on the other or take his chance that the INS would live up to its stated intent to initiate exclusion proceedings. Yes. Okay. But again, and I have to. Which I assume explains why Mr. Cabrera probably decided appeal was the better way to go. I don't know, Your Honor. I have no idea what Mr. Cabrera was thinking when he decided to do the appeal, but I have to point out, and I realize I'm way over my time. In fact, I just have a couple of minutes. That's an important case. That there is no prima facie, based on the record that exists now, which only has Mr. Salgada's allegations regarding the propriety and the legality of the deportation. Well, you're the one that invoked the professional judgment, so I'm just trying to understand what would have gone into that. I think we have the point. Okay. But again, there's no prima facie case of a Fourth Amendment violation in this case. And so there just simply wasn't enough even for the Board to go on and decide that there was a deportation proceedings versus exclusion proceedings, if there was any kind of deprivation of due process in this case, because there was no tolerable prima facie case allegations of a Fourth Amendment violation. All of the allegations regarding Fourth Amendment were in his motion, not in his affidavit. And the motion is simply statements by counsel that is not evidence that neither the Board, the IJ, or this Court may consider. Okay. We've got the point. Thank you. Okay. I'll give you a couple of minutes for rebuttal. Well, the first thing I would say is in that January 9th, 1997 hearing before the judge regarding termination, Mr. Cabrera did ask, he said, would it be possible to get the evidentiary hearing date before April then? It's on page 44 of the volume 1. Of which volume? Volume 1. Okay. Of the consolidated case. So he did ask. And what counsel admitted, he couldn't be assured that he'd get the case, the exclusion case anyway. So what route did he have? That the case could be scheduled or that the government would actually file an exclusion case. Exactly. The government would file it. And you just take, okay, well, yeah, we'll file it. I don't think so. And there were many allegations in the government's briefs to this Court, which the Court said in its decision, number 364 to 376, the government's brief. And the government's motion to dismiss, they said may be addressed in his exclusion hearing. And he still may be able to apply for relief. What's the site for that? That's excerpts of record page 384. Okay. I think we have the point. All right. Counsel, thank you both for the argument. That was a very helpful argument. Thank you both. Now the case just argued is submitted. All right. He does want to take a break. That would be a good idea. We'll take a short recess, no longer than five minutes. And counsel for the last case on calendar, which is the United States v. Consortium de Reliefs Estes Hommes, may take their places then. Oh, and go ahead. This is just the parties coming up. In terms of the order that you have, all those flurry or motions that have been put before us, we are taking that under submission. Just a sense of the panel is we're not excited about getting last-minute filings and changing the landscape as to what is at issue here and getting into the impact of the summary judgment arguments. So I don't feel you have to spend a whole lot of time on that. Let's argue the case as it was postured in the district court, although we're mindful that the landscape is changing. So you can adjust your arguments accordingly. Don't waste time on something we're not going to absolutely resolve today. Your Honor, I noticed on the calendar that this is a sealed hearing, and we have with us, just a few items on behalf of the government, Your Honor, Gary Fontana, who is the lead counsel for the commissioner, who is appearing as Lucas, and also other Assistant United States Attorneys involved in this case. I was wondering if it's permissible for them to be present. There's been no motion to exclude or seal the proceedings, so I don't know that there would be any problem. Thank you. Is there any objection to that? No objection. Okay. Thank you. All rise. The court will stand at recess until 5 p.m. The court is adjourned. The court is adjourned.
judges: Tashima, Fisher, Tallman